EDNA P. PARKS, ADMINISTRATRIX, RESPONDENT, v. MARYLAND CAS-UALTY COMPANY, APPELLANT.—91 S. W. (2d) 1186.

Kansas City Court of Appeals.   February 17, 1936.

*Charles S. Walden* and *Raymond E. Martin* for respondent.

*Harris & Koontz* for appellant.

BLAND, J.—This is a suit on an accident insurance policy. There was a verdict and judgment in favor of plaintiff in the sum of $2310.94. Defendant has appealed. The suit was brought by the insured, Harry D. Parks, but during the pendency thereof he died and the cause was revived in the name of Edna P. Parks, administratrix of his estate.

The policy provided:

"TOTAL DISABILITY. (1) Or, if such injury independently and exclusively of all other causes shall wholly and continuously disable the insured within thirty days from the date of accident from performing any and every kind of duty pertaining to his occupation, the Company will pay weekly indemnity at the rate hereinbefore specified for the period of such continuous total disability, but not exceeding fifty-two (52) consecutive weeks. After the payment of weekly indemnity for fifty-two (52) weeks as aforesaid, the Company will continue weekly payments of the same amount thereafter so long as the insured shall be wholly and continuously disabled by such bodily injury from engaging in any occupation or employment for wage or profit.

"INTERMEDIATE DISABILITY. (2) Or, if such injuries independently and exclusively of all other causes, shall within thirty days from the date of accident (or immediately following total disability), continuously disable and prevent the insured from performing a major portion of the daily duties pertaining to his occupation, the Company will pay three-fourths (¾) of the Weekly Indemnity above specified for the period of such disability.

"PARTIAL DISABILITY. (3) Or, if such injuries independently and exclusively of all other causes, shall within thirty days from the date of accident (or immediately following a period of total or intermediate disability), continuously disable and prevent the insured from performing one or more important daily duties pertaining to his occupation, the Company will pay one-half (½) the Weekly Indemnity above specified for the period of such disability. Indemnity for intermediate or partial disability, or for both, shall not be payable in excess of twenty-six consecutive weeks."

The policy further provided for double indemnity in case such injuries were sustained by insured "while riding as a passenger in a passenger elevator."

The petition seeks to recover double indemnity for total disability covering a period from January 14, 1931, to June 23, 1932. Defendant admits its liability to pay indemnity for partial disability but denies that insured was at any time totally disabled, within the meaning of the policy.

The facts show that on January 14, 1931, insured was injured, while attempting to enter an elevator in the Livestock Exchange Building in Kansas City, by the operator of the elevator closing the door thereto, striking him in the head; that insured was, when injured, a man 63 years of age; that he was employed as a cattle buyer by the W. E. Curtis Commission Company, located at the Stockyards in Kansas City; that the blow he received from being struck by the elevator door caused a bump to immediately appear on his head, above and a little forward of the left ear, about half the size of a hen egg; that he had been employed by the W. E. Curtis Commission Company for several years and prior to his injury he was a strong, able bodied man in good health; that he "ordinarily walked briskly and upright." "He was a big robust man, weighing about 225 pounds." "He was a good mixer" and jovial. He had experienced no serious illness theretofore. He was punctual and energetic in his attentions upon his duties. Shortly after being injured a witness saw insured seated in the office of his employer, holding and complaining of his head.

Plaintiff testified that she and her daughter called with the family automobile at the Livestock Exchange Building at the usual time that evening to take insured home; that when he walked across the street to get into the car she noticed his overcoat was thrown around his shoulders, his hat was "slouched" on his head, he walked slowly and unsteadily and was "unbalanced in his step;" that after he approached the car she observed that he had a pallor; that he was very slow in getting into the car and then "slumped in the back seat; that she then noticed "how cold he was;" that as they crossed the railroad tracks on the way home the car bumped and insured grabbed his head and said, "Oh, my head;" that when they reached

home she and the daughter helped him out of the car into the house and on to the davenport; that he was then "cold, shaking, moaning and complaining of his head;" that she got the evening meal and helped him to the table but he did not eat and sat holding his head and moaning; that thereafter she helped him back on to the davenport and covered him up; that while she was finishing her meal she heard him moaning again; that she then helped him upstairs to the bath room where he vomited violently; that she then took him to his room and put him to bed; that later in the evening he had another spell of vomiting, then he quieted down and slept some; that he got up at midnight, went to the bath room and sat on the tub, moaning and holding his head; that he then, for the first time, told her about the accident and showed her the lump on the side of his head; that he had a very restless night; that he went to the bath room several times and she noticed one or two times that he had an "unbalanced step;" "he would catch hold of things, catch hold of the wall and the door casings. Q. Did you on succeeding days observe his walk as to steadiness? A. It was the same, that unbalanced, unsteady, weaving, and he seemed in a dazed condition. . . . The conversations were disconnected, sometimes it would be sort of a mumble;" that after he vomited the second time he tried to tell her something but she could not understand what he said; that the next day there were periods when she could not understand him; that after he would rest awhile she could make out what he was trying to tell her; that he did not return to work until Saturday morning (he was injured on Wednesday), at which time he insisted upon going to work; that the insured and her son started to the stockyards in the car about 10:30 A. M., the son driving; that the son brought him back between 2:00 and 2:30 that afternoon; that customarily, prior to his injury, insured started to the stockyards about twenty minutes to six in the morning and stayed there until about 5:30 in the afternoon; that prior to his injury insured was at the stockyards every day (excepting Sunday) but thereafter he went there but two or three times a week; that he would go at "irregular times, and he would return at irregular times, he wasn't gone over an hour or an hour and a half;" that plaintiff's son or daughter took insured to the stockyards in the car and called for him each time, excepting about on three occasions when he went there on a street car; that in going to the street car he would use a cane and that on one of these occasions plaintiff assisted him; that if he was not brought home from work in the automobile he would return in a taxicab; that his staggering, unbalanced gait "continued right along; there were some days that to me it didn't seem quite so bad;" that plaintiff placed the furniture in the house in such a manner that insured could catch hold of it and steady himself in walking. She also stretched a clothes line in the back yard so that he could catch hold of something while

walking back and forth in exercising in the yard; that prior to and after the accident the newspaper was always placed on the table for him; that thereafter when insured was apparently reading the paper, "there were times that I would see that the paper would be upside down, or it would drop out of his hand. His cigar would do the same thing;" that he did not read the paper "to speak of" after the accident; that the last time he went to the stockyards was on the 25th day of March; that after he came home on that day plaintiff found him upstairs on the floor talking incoherently; that he had suffered an attack resulting in his right leg and arm becoming permanently paralyzed; that from then on he grew worse and in September he had another "stroke," after which time he was not "downstairs;" that he suffered another "stroke" on the 12th day of January and remained paralyzed until the time of his death on June 24, 1932.

She further testified that insured continued to draw his salary from the commission company until March 25, 1931; that his confusion of speech or difficulty in talking, continued during January and February, 1931; that "after a rest he could talk to us more clearly." "There were times when he was a little better and times he was worse;" that from the day of his injury until March 25 "there would be a day he would be home in bed and a day walking around the house, and then a day in the (stock) yards;" that his visits to the stockyards grew less; that from the date of his injury to February 11, he was not at the stockyards more than half the working days; that after he would stay at home for two or three days he would insist on "going down to work."

Plaintiff's daughter testified substantially the same as her mother as to what occurred the afternoon of January 14, 1931, when they went to the stockyards for insured. She stated that after his injury any noise, such as playing the piano would bother insured, "it seemed to hurt his head." She also testified as to the disconnected sentences of insured; that immediately after he was hurt "he would talk about some subject and then all of a sudden he would go on to something else that had no bearing with the first subject at all, didn't seem to carry on a connected conversation;" that his mental condition grew progressively worse; that he would carry a cane around the house and in going out of doors to steady himself in getting about; that she "noticed sometimes he would pick up the newspaper and would notice it would be upside down, just staring at it, like he was staring in space;" that there were times when he would talk in a normal manner for an hour or two and then at times he could not enunciate, that he would "just mumble;" that this happened "the first night," that is, the night of the day of the accident.

Plaintiff's son testified about taking insured to work and bringing him home in the car; that he noticed insured could not eat the night of the accident; that he had his hand up over his head at the dinner

table; that the witness took him to the stockyards on the first trip that insured made after the injury; that at this time the insured walked much slower than he ordinarily walked. "I don't recall the gait, but from that time he staggered, he would weave when he walked and be unsteady on his feet." . . . "Q. Did you have any occasion after the 14th of January, shortly thereafter, to observe as to whether there was any confusion in thought? A. I did, yes, he didn't carry on a connected conversation, when you would talk to him, that is all the time; he would have moments and periods when he would be all right, and just all of a sudden he would break and start talking about something else." . . . "He would bring the Daily Drover's Telegram home and would always go over the (live) stock market in that, and, of course, he would always read the evening paper, and from the time he was hurt on, he didn't seem to take the interest in things that he had before, and I have seen him lots of times sitting and holding the paper up as though he was reading, and I just walked up and looked at him and you could tell he wasn't reading it at all, he would just be sitting and staring at it."

The witness did not recall but one or two times that insured stayed at the stockyards, after his injury, as late as he customarily remained there before. The first time that he took insured to the stockyards after the latter's injury insured "could steady himself with a cane; he had a cane that morning, and walked out to the car, I was with him." "Q. Now, those other times you took him down he would walk out to the car? A. He would walk; as I say, he always used a cane after he was hurt."

Plaintiff's witness, Fred W. Witter, testified that he was a livestock salesman, employed by the W. E. Curtis Commission Company; that the buying or selling of livestock by that company was done by either W. E. Curtis, the insured or the witness and occasionally Mr. Curtis' son would buy; that insured's duty was to buy stocker and feeder cattle on orders from farmers, butchers, etc.; that on the afternoon after plaintiff was injured he saw him holding and complaining of his head in the office; that after this insured was never regular in coming to the office. In reference to his ability to carry on conversation the witness stated: "He was not right after that." "Well, he wouldn't talk at times, and then he would talk and it would be all out of time;" that he started to lose weight and continued to do so; that "He couldn't carry on an intelligent conversation." "Well, he would start to talk with them (customers) and apparently sound all right, and then it would go right off where it wouldn't be in the line he was trying to talk on at all;" that insured, before his injury, would go out in the yards and buy cattle unassisted but that between the time he was injured and March 25, the witness helped him buy cattle on ten different occasions. While there is no evidence as to the number of times that

insured was called upon to buy cattle during this period of time, the inference from the evidence is that ten times would be a small number compared with the whole number. However, the witness testified that he did not see insured buy any cattle anytime after he was injured and, evidently, the witness was in a position to see what insured ordinarily did.

The witness further testified that after insured was injured he saw Mr. Curtis go with insured at times when they were on a mission of buying cattle; that he had seen insured out in the stockyards "going along and hanging along on the fence;" that he "didn't walk straight;" that "his talking was mumbled up at times, not all the time;" that he did not stagger in his walk all of the time, but "just at times;" that "he would get up out of a chair and might walk across there pretty decent, for a little, and then go to staggering."

A physician, who was a relative of the insured, lived with him and treated him for his ailment. On January 31, 1931, insured called at the office of his regular physician, Dr. Irwig, who testified that he then examined him and found that "he had a swelling on his left side of his head, he had a pain in the head, that he couldn't sleep well, he could hear very little in his left ear, that he had a pain going down from his upper skull to his ear and neck; at times he was dizzy, and felt like falling down;" that insured told the witness that he had been struck on the head by an elevator door and that he could not work; that insured was "confused, he was unsteady." "He had a pain in the head, he was confused, he was talking strangely, he was talking confusedly, he was not steady, he was talking of going back to work the same day, and I told him he should go home, he should rest up, (he said) he couldn't do it." "I told him to stay at home, and he told me that he had to work. I saw he had a bump on his head, he was confused, he was unsteady;" that on January 31, 1931, he diagnosed insured's condition as "concussion of the brain;" that he next saw insured on February 5 and periodically thereafter and that insured's condition from the first got progressively worse; that on January 31, 1931, he noticed that insured had a change in his gait; that his gait was uncertain.

The doctor further testified: That insured "was changed from the time I saw him after the accident, he was talking continually, and he was different, I couldn't recollect exactly, but he just wasn't the same Mr. Parks. Q. He talked though connectedly? A. Yes, to some extent." On February 6 an X-ray picture was taken of plaintiff's head which showed no fracture but that his head was normal in every respect shown on the picture.

It appears that insured did not at first realize that he had been badly injured and it was only at the solicitation of the broker who wrote the policy that insured notified the company of his injury.

This testimony was brought out by the defendant who put the broker on the stand. He testified to the effect that, while he did not think insured's injury was serious, he thought insured should protect his rights in the matter, so he gave him a blank notice to fill out.

On February 10, 1931, insured wrote the broker as follows:

"Am enclosing report as you request. Reason I delayed was did not think injury was of serious nature but as grew worse I was advised to have Xray. Am still in hopes it will get O. K. my Dr. thinks I may lose hearing in left ear—but don't think so—you can do as you please about turning this report in to Company."

Insured enclosed the notice with this letter. In filling out the blanks in the notice he stated that the accident happened while he was getting on the elevator and was caused by his being struck by the door, which made him dizzy. "State if totally or partially disabled, and give your Surgeon's estimate as to the probable length of disability: Partially, Dr. says serious." Dr. Irwig first treated insured on February 6. At the bottom of the notice insured stated: "The reason I waited so long before seeing Dr. I did not realize I was hurt much but as I grew worse Stockyards Co. representative advised X-ray."

Plaintiff made a proof of loss which was on a blank furnished by the defendant. There is no evidence as to when this proof was made out but apparently it was about the 18th day of March, 1931. It was received by the defendant on March 25, 1931. In this proof insured stated that he first consulted a physician on January 30, 1931. Under the heading "Total Disability" the proof contains the following: "From what date and to date were you continuously and wholly disabled from performing *any and every kind of duty* pertaining to your occupation? From: Was not wholly disabled." Under the heading "Partial Disability" the following appears: "The important daily duty or duties pertaining to your occupation which you could not perform during the period of your partial disability were? Severe pain in head, sleeplessness, inability to concentrate and deafness."

Accompanying this proof, and a part of it, was a statement of the attending physician made upon a blank furnished by the company, in which the physician (Mr. Irwig) stated that he first saw insured at his office on January 30, 1931; that he found a "swelling on the left lateral head," which he stated was a "Haematoma." Certain questions were asked in the blank form under the heading "Total Disability" which were not answered but under the heading "Partial Disability" the doctor stated that insured was prevented from performing one or more important duties pertaining to his daily occupation "from 1-14-31 to date;" that he had prescribed as treatment, Rest, Medical, dietetics."

There was also accompanying the proof of loss a surgeon's report, likewise made by Dr. Irwig on a blank furnished by the company,

dated March 18, 1931, in which the doctor stated that insured had suffered a "slight concussion of the brain, fracture of left lateral head." "Describe the precise nature and extent of injuries received: Slight concussion (of) brain, Haemotoma of left lateral head." The report also contained the following: "Is the injury of such a nature as to prevent the claimant from attending to any and all duties pertaining to his occupation? Partial. Is he confined to the house? No. If not confined to the house, why do you consider that he is unable to attend to any part of his duties? Pain in head, dizziness, ringing of ear, nervous." In answer to the question: "How long, in your opinion, will total disability continue from date of accident?" The doctor inserted dash marks. The report also contained the following: "How long, in your opinion, will *partial disability continue thereafter?* to date."

It is insisted by the defendant that the evidence shows that insured suffered from arterio-sclerosis but we do not so construe it. Dr. Irwig did not testify that the examination of insured showed that he was so diseased but the doctor merely testified that he could not answer a certain question contained in the proofs by saying "yes" or "no," "because this man at his age has some arterio-sclerosis and if I write that down it takes time and it is mostly not necessary to do that."

It is insisted by the defendant that the court erred in refusing its instruction in the nature of a demurrer to the evidence. It will be noted that, under the terms of the policy, plaintiff was required to prove not only that insured suffered an accident resulting in an injury independently and exclusively of all other causes in total disablement but that, in order for there to be a recovery, the injury must have resulted in total disability *within thirty days from the date of the accident.*

Defendant claims that the evidence shows that insured was not totally disabled, within the meaning of the policy, within thirty days of the accident. In this connection it insists that plaintiff is conclusively bound by the notice of the accident and the proofs of loss furnished by him to defendant and it is pointed out, in this connection, that in the notice insured stated that he was only partially disabled and in his proofs of loss he stated to the same effect; that the statements of the attending physician and surgeon show to the effect that insured was only partially disabled and these statements were a part of the proofs furnished by insured.

The rule in connection with statements contained in notices and proofs of loss in cases of this kind is that they are conclusively binding upon insured, or his representatives, unless they are contradicted or explained at the trial. [Burgess v. Pan-Am. Life Ins. Co., 230 S. W. 315; Turner v. National Benevolent Society, 28 S. W. (2d) 125; Otto v. Met. Life Ins. Co., 72 S. W. (2d) 811.]

However, defendant points out that insured did not attempt to explain these documents and it contends that the cases, wherein it is held that the conclusive character of admissions of this kind can be overcome by explanation or contradictory evidence at the trial, were where the beneficiary furnished the proof rather than insured, himself, as in this case, and that where the insured furnishes the proof he alone can explain it and unless he does so the beneficiary is conclusively bound by it. The rule merely involves the weight to be given to an extra-judicial admission and is the same regardless as to whether the proofs were furnished by the beneficiary or the insured. [22 C. J., pp. 417 to 421.]

However, it is claimed that there is neither explanation nor contradictory testimony in reference to these admissions. Insured is dead and did not testify. Dr. Irwig, however, testified, in explaining as to why he wrote down that insured was suffering only partial disability, as follows:

"We mean different things in different cases. For example, Mr. Parks insisted he wanted to go back to work, and I couldn't write down 'total' because he couldn't draw total if he goes down one day, and of course we just settled the thing on partial disability. That is the way it is done. We don't think very heavily how we write this down always, just a piece of paper; I didn't think this man would die, he was getting gradually worse, but I didn't expect him to die when he first came to the office."

In this connection it is insisted that the court erred in admitting this testimony of the doctor. It is urged that the words "partial" and "total" are plain and unambiguous words and are not open to explanation. We think there is no merit in this contention. From a reading of the authorities construing disability clauses in policies of this kind, it will be seen that no ordinary layman would likely understand the meaning of the words "total disability" and "partial disability," as used in such policies. While Dr. Irwig had filled out before statements in proofs of loss he was not a lawyer. It was said in James v. Casualty Co., 113 Mo. App. 622, 629, that literally "Total mental disability means that one must have his mental faculties entirely suspended and total physical disability means the loss of power to move. It cannot be that the parties intended that before an assured could recover on the policy he should lie the full period of his injury in a state of coma. To interpret the clause in this contractual sense as defendant seeks to have us do, would render the contract utterly useless to an assured and would be nothing short, practically speaking, of collecting a premium without rendering a consideration." [James v. Casualty Co., supra, l. c. 629.] The court held that total disability as that term is used in these policies does not mean literally total disability but "is a disability as to performance of any substantial part of the business" of the insured or a disability dis-

abling the insured "from performing substantially the occupation stated in the policy," l. c. 628, 629.

There is nothing in the record to indicate that either insured or the doctor used the term "partial disability" as distinguished from "total disability" as the latter term is construed to mean by the authorities. In fact the explanation of the doctor tends to show that he did not use the term "partial disability," in filling out and swearing to the report, in any technical legal sense, but the testimony objected to indicates that he construed the term "total disability" to be where the injured person does not have the ability to go to his work and where he is in such a condition as indicating that he is going to die. In other words, it may be inferred that he construed the words "total disability" to mean something approaching a condition as defined by that term taken in its literal sense. There is much to be found in that part of the notice and proofs signed by insured, himself, to indicate that he was under the same misapprehension as to the meanings of the terms used therein and describing his condition.

However, in any event, the statements in the notice and proofs to the effect that the disability suffered by plaintiff was only partial was contradicted by the parol testimony at the trial. There is no question but that, under the evidence, the jury could have arrived at the conclusion that insured, as a result of the accident, was totally disabled within thirty days thereafter. In the James case it was stated: "We therefore hold the contract to mean, not that the assured was rendered absolutely and literally unable to perform any part of his occupation but that he was disabled from performing substantially the occupation stated in the policy."

In this case insured had various things to do in order to perform his occupation. He not only was required to actually buy cattle but he was required to read newspapers and publications containing quotations and information relative to the price of cattle in the various markets. In addition, he was required to go about the stockyards and familiarize himself as to the character of cattle on sale and what prices they were bringing. He was required to view and examine cattle, including those upon which he was required to make bids. He had to familiarize himself with livestock conditions, generally, with reference to cattle and the element of supply and demand. As one witness put it insured was required "to be on his toes." It was also necessary for him to meet and talk with customers during the thirty day period after his injury. It may be fairly inferred that insured was really not able to return to the stockyards for work at any time after his injury. The doctor advised him not to do so but his devotion to duty, perhaps reinforced by his financial circumstances, together with his confidence in himself in view of his previous rugged health, prompted him to go to work, notwithstanding his unfit con-

dition. Without prolonging this opinion by again reviewing the evidence *in extenso* it is enough to say that there was ample evidence from which the jury could find that thirty days after receiving his injury insured was disabled from performing the substantial duties pertaining to his employment.

This court in the recent case of Heald v. Aetna Life Ins. Co. of Hartford, Conn., No. 18437 (not yet reported) in this connection stated the law as follows:

"The provisions of a policy of the character before us are not to be given a narrow or a technical interpretation which would defeat the intentions of the parties, but a rational and practical construction. It has been often remarked that to construe such policies literally would often deprive the insured of the benefits intended to be provided. [See Young v. Travelers Ins. Co., 80 Me. 244; James v. U. S. Cas. Co., 113 Mo. App. 622.] Therefore, the policy is given a liberal construction. The term 'total disability' is a relative one, depending in a degree upon the nature of insured's employment and other peculiar facts and circumstances of the particular case. Broadly speaking, the courts attempt in a case of this kind to construe the policy so as to furnish indemnity to the insured for loss of time by reason of accident or injury, which prevents him from pursuing his usual occupation or carrying on his regular business. [7 Couch, Cyc. Ins. Law, pp. 5766, 5776. See, also, James v. Cas. Co., supra; Foglesong v. Modern Woodmen of Am., 121 Mo. App. 548; Bellows v. Travelers Ins. Co., 203 S. W. 978; Katz v. Union Cen. Life Ins. Co., 44 S. W. (2d) 250; Columbia Cas. Co. v. McHargue, 54 S. W. (2d) 617; U. S. F. & G. Co. v. Hardeman, 22 S. W. (2d) 1112; Commonwealth v. Bryant, 248 S. W. 893; Fid. & Cas. Co. v. Getzendanner, 56 S. W. 326; Aetna Life Ins. Co. v. McCullagh, 229 S. W. 1033; Aetna Life Ins. Co. v. Spencer, 32 S. W. (2d) 310; Frost v. Central Bus. Men's Ass'n., 246 S. W. 628; Young v. Travelers Ins. Co., supra; Mutual Life Ins. Co. v. Dowdle, 71 S. W. (2d) 691; Standard Acc. Ins. Co. v. Cherry, 40 S. W. (2d) 875.]

"It is not necessary that insured 'be rendered absolutely helpless' but, he is required to show merely 'such a disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and customary way.' [7 Couch, Cyc. of Ins. Law, p. 5769.] The test is 'ability or inability substantially or to some material extent to follow his usual pursuit.' [7 Couch, Cyc. of Ins. Law, p. 5772.] The policy does not mean that the disablement must be such as to render it physically impossible for insured to perform any of his usual duties. [7 Couch, Cyc. of Ins. Law, p. 5774.]

"It is true, as defendant contends, that in order for plaintiff to recover it was necessary to show that he had suffered such a disability as to prevent him from performing any and every substantial

duty pertaining to his occupation. However, in construing a similar policy, the Court of Appeals of Kentucky in Columbia Casualty Co. v. McHargue, supra, stated: 'If the insured was prevented from transacting any substantial, material or important part of his business or doing or performing any substantial, material or important thing or duty customarily done or performed in his occupation, he is totally disabled.' Consequently, it is not sufficient, in order to deprive the insured of recovery, that the injury resulting from the accident render him unable to perform all of his duties pertaining to his occupation but he must be able to perform them with substantial and reasonable effectiveness. If he cannot do so he is totally disabled, within the meaning of the policy and, if the evidence is such that there may be a difference of opinion among fair minded men as to whether insured has become totally disabled, the question is for the jury. [Hartford Acc. & Indem. Co. v. Davis, 210 S. W. 950, 952.]

"In the case of James v. Casualty Co., supra, this court said, 1. c. 628: That plaintiff is entitled to recover if he can show 'that he was disabled from performing substantially the occupation stated in the policy.' From a reading of the authorities it appears that if insured has been deprived of the ability to perform one of the material and substantial duties of his occupation, then it should be said that he cannot perform his occupation, for the reason, that if he is deprived of the ability to perform one of the material and substantial duties of it, then he cannot perform it as a whole."

See, also, Stoner v. New York Life Ins. Co., No. 18249, decided by this court but not yet reported.

It thus will be seen that even though the notice and the proofs of loss did state to the effect that insured was only partially disabled, there was ample evidence that he was totally disabled, within the meaning of the policy and, therefore, even could it be said that they were not explained, there was ample evidence from which the jury could say that they were contradicted.

However, defendant contends that this policy is worded differently from those in the cases which we have referred to, supra; that those cases were based upon policies containing a provision for total disability only and the question was whether insured was totally disabled, within the meaning of a single disability clause; that here other disabilities are provided for, to-wit, intermediate disability and partial disability and that it is necessary to construe the policy as a whole in order to arrive at the intentions of the parties; that it was within the power of the parties to say in the policy what should be total disability, intermediate disability and partial disability. We may say that we find that the policies construed in the Bellows and Heald cases, supra, contained disability clauses other than one for total disability.

However, it may be admitted, as defendant contends, that the parties have the right to define the various disabilities in such a manner as they see fit and the courts are bound thereby. In the case at bar it will be noticed that the policy describes total disability as an injury disabling the insured "from performing *any and every kind of duty* pertaining to his occupation. Intermediate disability is described as an injury continuously disabling and preventing insured "from performing *a major portion of the daily duties* pertaining to his occupation," and partial disability as an injury disabling and preventing "insured from performing *one or more important daily duties* pertaining to his occupation." (Italics ours.)

In arguing this point defendant contents himself by saying that the parties are privileged to separate the disabilities into three classes and that the courts must defer to their action in this regard, but no effort is made, by the defendant, to define the clauses "any and every kind of duty," "a major portion of the daily duties," or "important daily duties," as used in the policy.

From an examination of the authorities, supra, it will be seen that in an effort to make these disability clauses workable, so as not to deprive the insured of the protection intended, the courts have refused to apply the term total disability in a technical sense. If the insured is so far disabled that he cannot perform, as a whole, the substantial duties of his occupation, even though he may be able to perform some of his duties, he is totally disabled within the meaning of the policy. In the light of these decisions one would be totally disabled if he were disabled from performing a major portion of his daily duties for if he were so disabled he could not perform, as a whole, the substantial duties of his occupation. It would appear that the same may be said of disablement from performing one's important daily duties. In fact it is difficult, as a practical matter, to distinguish between a major portion of one's duties and one's important duties. An important duty could hardly be a minor one. It would appear that, in attempting to separate the disabilities, an effort has been made to divide the indivisible, that is to say, it seems to us all three of them provide for total disability in a practical sense. We recognize the right of the parties to separate the word "disability" into as many parts as they choose and that a policy may define total disability as something other than total disability, as defined in the authorities, supra, but when the policy is drawn in an effort to do this, it should be so worded as to be unequivocable and to leave no doubt as to its meaning. Here the terms employed to describe the various disabilities are without definition, criterion or yardstick that can be used in applying them to a given state of facts.

If defendant, in drawing the policy, meant to provide that there could be no total disability unless it met the definition of that term, in a literal sense, it should have said that insured could not recover

for such a disability unless he suffered an injury resulting in his mental incapacity or lying in a state of coma, or substantially so, as described in the James case, l. c. 629. Defendant does not contend that the policy means anything like this, yet, in order to give effect to its contention we would be required, in effect, to so hold. Take this case for instance. Insured might have been so injured as to become bed ridden, in fact, unable to turn over in bed without assistance, still he might have retained enough mental vigor to be able to read newspapers and reports and thus familiarize himself with livestock conditions and prices of cattle and by telephone or through his wife communicate such information to his employer. In other words, he still would have been able to perform one of his duties, and an important one at that, yet, to give effect to defendant's contention we would have to hold that insured was not totally disabled, though he would have no ability to carry on his occupation in any practical sense.

When, and if, an accident insurance company has the hardihood to offer to the public a policy providing, in unambiguous terms that total disability means, in substance, that the insured must be mentally incompetent or in a state of coma, or to use a homely colloquialism, be completely "flabergasted," and it succeeds in selling such a policy and it comes before us for construction, we will give it the meaning that defendant contends for in this case, but not otherwise. Under the circumstances we will construe the policy in its most favorable light to the insured (Heald v. Ins. Co., supra), and find that he was totally disabled, within the meaning of its terms.

It is claimed, however, that there is no evidence that the disability of the insured was the result of the accident, independently of all other causes. There was expert testimony that the condition that insured was found to be in following the accident, and within thirty days thereafter, could have been caused by the accident but there was no direct testimony that it could have resulted independently of all other causes, as provided in the policy. However, it was not necessary for plaintiff to introduce expert testimony tending to show that insured's injury was the result of the accident, independently of all other causes, as the jury was competent to arrive at its own conclusions as to the matter, under all of the circumstances, without expert testimony on the question. [Bellows v. Travelers Ins. Co., 203 S. W. 978; Wheeler v. Fid. & Cas. Co. of N. Y., 251 S. W. 924.]

It is insisted that the court erred in permitting the expert testimony to the effect that the blow plaintiff received could have resulted in his condition as described in the testimony, for the reason that this was not the issue, the issue being whether the blow "resulted independently and exclusively of all other causes" in the continuous and total disability of the insured. There was no error committed in this regard. It was necessary for plaintiff to show that

insured's injury was the result of the accident and this, in effect, was what the question propounded to the expert sought to elicit. Whether the blow resulted independently and exclusively of all other causes in insured's injury was a matter that could be inquired into, or proved, independently of expert testimony on the subject.

Complaint is made of the giving of plaintiff's instruction No. 2 which defines the term "wholly disabled," or "total disability," within the meaning of that term as used in the policy. While it would have been better had the instruction applied the terms used in the policy to the facts in the case, the definition contained in the instruction seems to meet the requirements of the law as laid down in the James and Bellows cases, supra. We find no reversible error in the giving of this instruction.

It is insisted that the court erred in giving plaintiff's instruction No. 4, which told the jury that "if the operator in charge thereof stopped said elevator at the 4th floor of said building for the purpose of receiving passengers thereon, and caused the door of said elevator to open, and that thereupon Harry D. Parks, with the intention in good faith to become a passenger thereon, if you find such to be the fact, stepped into said elevator and on the floor thereof, then the said Parks was a passenger in said elevator within the meaning of the terms of the insurance policy read in evidence." This instruction was upon the double indemnity feature of the policy.

There was only one witness to the accident. This was plaintiff's witness, Fred W. Witter. He testified that insured was standing, waiting for the ascending elevator, there being a number of elevators there; that insured intended to go upstairs for his lunch; that when the elevator which insured intended to board reached the floor the operator thereof opened the door and insured stepped with his right foot into the elevator.

The following appears on cross-examination of the witness by the defendant: "Q. Here is the elevator, here is the door (indicating). Had his body gotten past his head after it got in far enough to be hit? A. His weight was like that (indicating); he was like that, he was in the elevator. Q. Where was the other foot? A. It was coming along behind. Q. Was it on the ground? A. No, sir, he had lifted it up like this (indicating). Q. It was lifted up like this on one foot? A. Yes, sir. Q. The elevator man closed the door and went on up? A. No, sir, he didn't close the door and go on up, he hit him in the head and dropped back and then he went on in. Q. And the elevator man closed the door and went on up? A. Yes, sir;" that insured, when struck, "was right in the edge of the elevator." On direct examination he testified: "Q. Now, as the car came up did it carry Mr. Parks with it? A. Yes, sir. . . . The door bounced back and he just kind of stumbled on into the car. Q. The rest of his body passed into the car? A. Yes, sir;" that

the car continued slowly upward for about six inches, when it stopped momentarily, then it went on up carrying insured with it.

The policy provided for double indemnity provided the injuries to insured were sustained while riding as a passenger in a passenger elevator. Under the testimony, literally speaking, it would seem that insured was not in the elevator at the time he was injured. However, he was on the elevator. He had one foot in the elevator and part of his body thereon and was on it to such an extent that it would seem that when the elevator passed the floor and went on up it took his body with it. A substantial part of the testimony consisted of a demonstration by the witness to the jury as to how the accident happened and we are not in as favorable situation as was the jury to pass upon the matter of what actually took place. The word "in" is sometimes used interchangeably with the word "on" and is so used in policies containing clauses of this kind. [Schmohl v. Trav. Ins. Co., 189 S. W. 597.] We think there was no error in the instruction. [Fay v. Aetna Life Ins. Co., 187 S. W. 861; Schmohl v. Trav. Ins. Co., supra; James v. Casualty Co., supra; Distiler v. Columbia National Life Ins. Co., 227 S. W. 133.]

It is insisted that the court erred in refusing defendant's instruction D, which sought to tell the jury that the proofs of loss were binding upon the plaintiff unless insured was "misled or misinformed as to his condition of disability" when he furnished them. As before stated, even though insured was neither misled or misinformed as to his condition, plaintiff was not bound by the proofs, if they were contradicted, and as we have held, the evidence establishes that they were. In addition to this we do not think that the words "misled" or "misinformed as to his condition" are equivalent to the word "explained" under all of the facts and circumstances connected with this case.

It is insisted that the court erred in refusing defendant's instruction F. In order for there to be a recovery for double indemnity this instruction required insured to be "actually in the elevator and riding as a passenger in the elevator at the time of his injury, if any." From what we have said there is no merit in connection with this contention.

It is insisted that the court erred in giving defendant's instruction F as amended. The court amended the instruction as offered by striking out "was actually in the elevator and riding as a passenger in the elevator" and inserting in lieu thereof the words "was riding as a passenger in a passenger elevator." It is claimed that by the amendment the court, in using the language of the policy, submitted to the jury the interpretation of the policy. However, this instruction should be read in connection with the provisions of instruction No. 4, and in so doing the jury could not have been misinformed.

It is insisted that the court erred in refusing defendant's instruction G, which reads as follows:

"The court instructs the jury that if you find and believe from the evidence that the deceased, Harry D. Parks, within thirty days after having received the injuries charged, continued to go to the stockyards and to perform his duties in connection with the purchase of livestock as an employee of W. E. Curtis & Company, then your verdict must be for the defendant."

There was testimony on the part of the defendant that, while insured suffered from headaches and was somewhat mentally disturbed after his injury, he went regularly to his duties and was able to discharge them in a satisfactory manner. The court amended the instruction by submitting it in the following form:

"The court instructs the jury that if you find and believe from the evidence that the deceased, Harry D. Parks, within thirty days after having received the injuries charged continued to go to the stockyards and to perform *any substantial part of his duties in connection with the position and as an employee of the W. E. Curtis Company* then your verdict must be for the defendant." (Italics ours.)

From what we have said the instruction as offered was properly refused and it was given in a form as favorable to the defendant as it was entitled to.

It is insisted that the court erred in giving instruction No. 3 on the part of the plaintiff:

"The court instructs the jury that if you find and believe from the evidence that said Harry D. Parks made certain statements as to the extent of his disability in the notice and proofs of loss shown in evidence, and if you further find there was substantial evidence of other facts in evidence tending to explain or contradict such statements, then such statements, if any, are prima facie only and are not conclusive, but may be considered by you as circumstances in determining the weight and credibility you will give to such statements under all the evidence."

This instruction was plainly erroneous. It was not a question as to whether there was other evidence *tending* to explain or contradict such statements. The fact that there was evidence merely tending to explain or to contradict the proofs did not rob them of their conclusive effect unless the jury believed that they actually did explain or contradict the statements contained therein. It was the theory of the parties at the trial that it was proper to instruct on this subject, as both parties offered instructions on it. However, in view of the sharpness of this issue, it was particularly important that the court properly instruct the jury in reference to the matter.

There are other points raised but, as they will not likely occur again at another trial, it is not necessary for us to pass upon them.

The judgment is reversed and the cause remanded. *Shain, P. J.,* concurs.